JOURNAL ENTRY and OPINION
{¶ 1} Appellant Marion Jones appeals from the trial court's order entering summary judgment in favor of Swagelok Company (Swagelok), on his claim of race discrimination. Jones assigns two errors for our review:
 {¶ 2} "I. The trial court erred in granting summary judgment on plaintiff's race discrimination claim because there were genuine fact issues as to whether plaintiff was qualified."
 {¶ 3} "II. The trial court erred in granting summary judgment on plaintiff's race discrimination claim because there were genuine fact issues as to whether defendant's legitimate, non-discriminatory explanation for treating plaintiff worse than his similarly situated white coworkers was pretextual."
 {¶ 4} Having reviewed the record and the legal arguments of the parties, we reverse the trial court's decision and remand for further proceedings. The apposite facts follow.
 {¶ 5} Jones filed suit against his former employer, Swagelok, in the Cuyahoga Common Pleas Court, alleging race discrimination in violation of R.C. 4112.02. The alleged discrimination resulted from Swagelok assigning Jones an unfair amount of work compared to white workers, causing Jones's work performance to deteriorate.
 {¶ 6} After discovery, Swagelok moved for summary judgment, which Jones opposed. The trial court granted the motion, finding Jones failed to establish a prima facie case because the evidence indicated Jones was not meeting the legitimate expectations of Swagelok and there was no evidence of pretext.
 {¶ 7} Jones began employment with Swagelok on April 17, 2000. He was hired as a buyer in the purchasing department. He was the only African-American in the department. At the time, his immediate supervisor was Jesse Dolan. For the first six months, Jones was assigned four vendors, which consisted primarily of plating companies. As a buyer, through computer processing, Jones ensured parts were shipped from Swagelok to the plating companies, shipped back to Swagelok for inspection, and either shipped to customers or stocked on shelves.
 {¶ 8} Dolan conducted Jones's first two job reviews, one after sixty days of employment and the other after six months. Both reviews were satisfactory. In the spring of 2001, Dolan left Swagelok and Kathy Waltermire became Jones's new supervisor. At the same time, James Rudary became the new department manager.
 {¶ 9} Jones previously worked with Waltermire when she was a "senior buyer." Jones had no problems with Waltermire at that time. He recalled, however, an incident when he asked her a question and she responded to him using what he described as an "old slavery type tone." When asked to elaborate, he said, "slow, bad grammar, and lazily." This occurred approximately ten months before Waltermire became Jones's supervisor.
 {¶ 10} Once Waltermire became Jones's supervisor, his workload gradually increased from four-to-five vendors to eleven-to-twelve vendors. Jones contends this drastically increased his workload. According to Waltermire, however, Jones's workload was equal to or less than the other buyers.
 {¶ 11} Jones frequently complained his workload was greater than his co-workers, but Waltermire dismissed his complaints by chuckling and saying, "Oh, it's just you Marion." Jones was aware Diana Parry, who complained to him about being overworked, received assistance from Waltermire. Jones was also assigned one of Parry's accounts around this time. Jones claims he received five other accounts from white co-workers who were complaining about their workload.
 {¶ 12} According to Waltermire and Rudary, the shifting of accounts due to workload never occurred. They explained suppliers were sometimes moved around in order to ensure all of their orders were serviced by one buyer.
 {¶ 13} The buyers' performance results were issued twice a month. The reports indicated the number of "open orders" and "refer to ready for release orders" varied in amount among the buyers from month to month. Consistently, however, Jones had more "firm-planned" orders. At the time he was terminated, Jones had 2,099 "firm-planned" orders while comparatively, his white co-workers had anywhere from five to a few hundred to "firm-planned" orders.
 {¶ 14} "Firm-planned" orders are placed up to six months ahead of time by customers and do not need work until ready for opening. According to Waltermire and Rudary, only a small percentage of Jones's "firm-planned" orders would have to be worked on at any given time because the computer system automatically moves the orders along the time line until ready for opening. According to them, Jones received most of the "firm-planned" orders because they usually involved processed parts, which was Jones's area of responsibility. Ron Lewayne, however, also worked in processing and received far less "firm — planned" orders. Rudary stated Lewayne also worked on "formed" orders, although the KPI results do not indicate this.
 {¶ 15} Jones contends although the "firm-planned" orders are self-processing for a specified amount of time, if he did not work on them prior to their becoming ready, he would be flooded with orders. Therefore, Jones stated it was "essential for me to work on firm-planned orders to avoid falling further behind." The KFI results indicated that Jones also had more messages to respond to than the other employees and that the messages increased in direct proportion to his work orders.
 {¶ 16} Waltermire does not recall Jones complaining about the amount of "firm-planned" orders; but Jones contends that the orders were a constant topic of discussion with her. Jones also contends prior to Waltermire becoming his supervisor, he was not assigned the bulk of the "firm-planned" orders; therefore, the mere fact he was responsible for processed orders did not justify his receiving most of the "firm-planned" orders.
 {¶ 17} Starting October 2001, Jones was placed in the "coaching" program to address his poor performance. He remained in "coaching" mode until his termination, meeting frequently with Waltermire regarding performance issues. Throughout this time period, Jones's "firm-planned" orders continued to increase.
 {¶ 18} His year-end review was conducted on January 9, 2002. Waltermire noted in her written review:
 {¶ 19} "I met with Marion for his end of year review. I explained where he was below expectations and where he had improved. His KPI numbers that had improved in November, where [sic] reverting back to an unacceptable level. Missing text on manufacturing orders continues to be a problem and purchase orders are still being returned for incorrect data. There were 8 documented occurrences between 12/14 and 1/17."
 {¶ 20} Waltermire and Jones met again on January 29, 2002 to discuss his final rating for 2001. As part of this meeting, Jones, as were all associates, was asked for his comments and accomplishments to place in the year-end review. Jones gave himself the lowest rating, "below expectations" and under the comment section wrote, "will try harder." Jones contends he rated himself this way because he knew Waltermire believed he was performing "below expectations" and he did not want to "rock the boat."
 {¶ 21} Waltermire continued to document Jones's performance problems. According to Waltermire's coaching notes, she offered her assistance to Jones. However, Jones claims Waltermire never offered to help him and did not request a senior buyer to help him. He noticed senior buyers were assigned to help his white co-workers who were falling behind. When he pointed this out to Waltermire, she appeared surprised he knew this.
 {¶ 22} In April 2002, Waltermire recommended to Department Manager Jim Rudary that Jones be terminated. After consulting with the Human Resources Department Rudary terminated Jones on May 10, 2002. Rudary advised Jones he was terminated due to poor performance. As Waltermire escorted Jones out of the building, he told her "now the battle begins," because he felt the reason he was terminated was his race.
 {¶ 23} Jones admits he was aware of Swagelok's policy prohibiting harassment during training. The policy requires an individual to report any form of harassment to a member of the management or to human resources. Jones did not report the alleged racism by Waltermire because he did not want to create problems.
 {¶ 24} Along with Jones, two of his white co-workers were also dismissed for poor performance. Kim Engbert was terminated in the fall of 2001 and Chris Anderson was terminated in late 2002. However, neither of these workers had the enormous quantity of "firm-planned" orders that Jones did.
 {¶ 25} In his first and second assigned errors, Jones contends the trial court erred in granting summary judgment because genuine issues of fact remain regarding whether he was qualified and whether Swagelok's business reason for terminating him was pretextual.
 {¶ 26} We consider an appeal from summary judgment under a de novo standard of review.[1] Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.[2] Under Civ.R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can only reach one conclusion which is adverse to the non-moving party.[3]
 {¶ 27} The moving party carries an initial burden of setting forth specific facts which demonstrate his or her entitlement to summary judgment.[4] If the movant fails to meet this burden, summary judgment is not appropriate; if the movant does meet this burden, summary judgment will only be appropriate if the non-movant fails to establish the existence of a genuine issue of material fact.[5]
 {¶ 28} R.C. 4112.02(A) provides:
 {¶ 29} "It shall be an unlawful discriminatory practice:
 {¶ 30} "For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."
 {¶ 31} R.C. Chapter 4112, is Ohio's counterpart to Section 2000e, Title 42, U.S. Code ("Title VII"). Therefore, federal case law interpreting Title VII is generally applicable to cases brought under Chapter 4112.[6] In McDonnell Douglas Corp.v. Green,[7] the United States Supreme Court established a flexible formula to ferret out impermissible discrimination in the hiring, firing, promoting, and demoting of employees.
 {¶ 32} A prima facie case of discrimination under theMcDonnell Douglas framework requires a plaintiff to establish that he or she: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position either lost or not gained; and (4) that the position remained open or was filled by a person not of the protected class.[8]
 {¶ 33} A plaintiff can also make out a prima facie disparate treatment case by showing, in addition to the first three elements, that the employee was "treated differently than a similarly situated employee from outside the protected class."[9] To be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for that conduct.[10]
 {¶ 34} The establishment of a prima facie case of discrimination under McDonnell Douglas creates a presumption that the employer unlawfully discriminated against the employee.[11] In the instant case, the parties do not dispute that Jones is an African-American and was terminated. Therefore, the first two elements of asserting a prima facie discrimination case have been met.
 {¶ 35} Whether Jones was qualified for the position or received disparate treatment are intertwined in this case because they both involve consideration of Jones's workload compared with white co-workers in his department. In order to demonstrate qualification for a position, a plaintiff must not only demonstrate the capability of performing the work, but must also demonstrate that he or she is meeting the employer's legitimate expectations.[12]
 {¶ 36} Prior to Waltermire becoming Jones's supervisor, his performance was rated as "meeting expectations." It was not until after Waltermire became his supervisor that his performance became an issue. At this same time, Jones's workload drastically increased. Although Waltermire and Rudary claim the work was evenly distributed among the buyers, the KPI performance reports indicate Jones received far more "firm-planned" orders than his co-workers.
 {¶ 37} Waltermire and Rudary claim the "firm-planned" orders were self-executing and did not require a lot of work. But Jones claims in his affidavit that he had to regularly attend to the orders due to the huge volume so that they would not become urgent orders when they became due. He also claims in order to be "proactive" with these orders, he had to check them regularly in the computer, which required at least five minutes per order.
 {¶ 38} In addition to the "firm-planned" orders, Jones also attended to "straight" orders. It does not appear from the KPI results that any of Jones's co-workers had to simultaneously deal with such a large volume of "firm-planned" orders along with "straight" orders. Although Waltermire and Rudary believed Jones received more "firm-planned" orders because he was responsible for processed parts, the KPI reports indicate Ron Lewayne, who was also in the processing department, had significantly fewer "firm-planned" orders than Jones. The KPI results also indicate Jones consist-ently had more "referred for ready" orders than Lewayne and more messages to respond to in correlation with these orders. Rudary explained Lewayne also worked on "formed" orders, and Jones did not. However, the KPI results do not list Lewayne in the "formed" orders section.
 {¶ 39} According to Jones he continually complained to Waltermire about his excessive workload. However, she dismissed his complaints. Jones stated white workers who complained about their workload received assistance. Waltermire claims she told Jones to request assistance, but he never did so.
 {¶ 40} As we stated above, in determining whether a genuine question of material fact exists, a court is obligated to view the evidence in favor of the nonmoving party.[13] It appears the trial court, by finding Jones was not qualified, used a higher standard than should be used in determining a summary judgment motion. In responding to a movant's motion for summary judgment, the nonmoving party does not need to try its case at this juncture, but must produce more than a scintilla of evidence in furtherance of its claims.[14] We believe Jones met this burden and conclude the conflicting evidence regarding Jones's workload and assistance offered, creates genuine issues of fact as to whether Jones was qualified and received disparate treatment.
 {¶ 41} Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that its actions regarding the plaintiff were taken based on legitimate nondiscriminatory reasons.[15] Thereafter, the burden again switches to the plaintiff, who must show that defendant's stated justification is in fact merely a pretext for unlawful discrimination.
 {¶ 42} In order to establish whether an employer's reason for termination is a pretext for discrimination, an employee must show that the employer's proffered reason is not credible or that discriminatory reasons "more likely" motivated the employer's decision.[16] The burden of persuasion remains at all times with the employee.[17]
 {¶ 43} Based on the evidence, we conclude it is a disputed issue of fact whether Swagelok's reason for terminating Jones for poor performance was a pretext for discrimination. If Jones was assigned more work than his similarly situated white co-workers, this would significantly impact the quality of his performance; therefore, Jones's termination for his poor performance becomes suspect. Summary judgment is a procedural device to terminate litigation, so it must be awarded cautiously, with any doubts resolved in favor of the nonmoving party.[18] Accordingly, Jones's two assigned errors are sustained.
Judgment reversed and remanded for further proceedings consistent with this opinion.
This cause is reversed and remanded.
It is, therefore, ordered that said appellant recover of said appellee her costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Gallagher, J., concur; Corrigan A.J., dissents.
 (SEE ATTACHED DISSENTING OPINION.)
[1] Baiko v. Mays (2000), 140 Ohio App.3d 1, citing Smiddyv. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35; NortheastOhio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs. (1997),121 Ohio App.3d 188.
[2] Id. at 192, citing Brown v. Scioto Bd. of Commrs. (1993),87 Ohio App.3d 704.
[3] Temple v. Wean United, Inc. (1997), 50 Ohio St.2d 317,327.
[4] Dresher v. Burt, 75 Ohio St.3d 280, 292-293,1996-Ohio-107.
[5] Id. at 293.
[6] See, Genaro v. Cent. Transport, Inc. (1999),84 Ohio St.3d 293, 295, 1999-Ohio-352; Plumbers Steamfitters Commt. v.Ohio Civil Rights Comm. (1981), 66 Ohio St.2d 192, 196.
[7] (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.
[8] Id.
[9] Policastro v. Northwest Airlines, Inc. (C.A. 6, 2002),297 F.3d 535, 538, citing Mitchell v. Toledo Hosp. (C.A. 6, 1992),964 F.2d 577, 582-583.
[10] Mitchell, supra, at 582-583; Kanieski v. Sears, Roebuck Co., Cuyahoga App. No. 80833, 2003-Ohio-421.
[11] Texas Dep't of Community Affairs v. Burdine (1981),450 U.S. 248, 254, 67 L.Ed.2d 207, 101 S.Ct. 1089.
[12] Smith v. Greater Cleveland Reg. Transit Auth. (May 24, 2001), Cuyahoga App. No. 78274.
[13] Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317.
[14] Turner v. Turner (1993), 67 Ohio St.3d 337, 340; Wagnerv. Armbruster, (1996), 108 Ohio App.3d 719.
[15] Id.
[16] See Reeves v. Sanderson Plumbing Prod., Inc. (2000),530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105, citingTexas Dept. of Community Affairs v. Burdine (1981),450 U.S. 248, 255-256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207.
[17] Id.
[18] Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356,358-359.